IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 25-CR-4001 |
| | ) | |
| vs. | ) | |
| | ) | |
| KEITH HAVENER, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S RESISTANCE TO DEFENDANT'S
MOTION TO DISMISS THE INDICTMENT**

COMES NOW, the United States of American and hereby files its resistance to defendant's Motion to Dismiss the Indictment. (Doc. 59.) The government requests a hearing and oral argument on the motion.

## I. BACKGROUND

On January 16, 2025, the grand jury returned the Indictment in this case, which charges defendant with two counts of sexual exploitation of children and one count of possession of child pornography. (Doc. 16.)

## II. FACTS

Beginning in approximately June of 2024, defendant began using generative AI technology to "nudify" images of coworkers and his minor step-grandchildren. Defendant was also using computer technology to superimpose the faces and likenesses of these individuals onto the nude bodies of adult actors engaged in sexually explicit conduct. Defendant would then distribute the images of the "deepfake" nude images of coworkers and minor children to others – sometimes to

1

harass them; other times to entice other online predators to engage in interstate travel in the hopes of engaging in sex acts with the minor children. Defendant had also created several email accounts similar in name to the minor victims in this case and pretended to converse with these other online predators as the minor victim seemingly acting as a willing participant. Defendant made it appear as if the minor victims were sending nude images of themselves to the online predators.

When defendant's employer learned of this conduct involving his coworkers, it turned defendant's work-computer over to law enforcement and consented to its search. Agents discovered the child pornography at that time and confirmed it through search warrants to defendant's various Google accounts and electronic devices seized from his home at the time of his arrest on January 6, 2025.

Forensic analysis of defendant's devices and Google accounts discovered 1,025 nude images of children, mostly that appeared to use generative AI. Over 250 of those nude images are of MV1 and MV2. Several dozen more involved another identified, but yet-to-be-charged, victim, MV3. Dozens more victims could be identified as defendant would often use group photos of MV1, MV2, and MV3 and the generative AI would "nudify" all the children in the picture. The "nudified" images depict a range of nudity of the minor victims. Often, the images portray the victims in public spaces, fully nude with exposed breasts and vaginal areas. The genital development in the "nudified" images is almost exclusively age-appropriate to children around 11-14 years of age, with little to no pubic hair seen. The breast development is often more pronounced than would be expected for a child that age.

2

However, several of the nudified images have multiple iterations of the same images, indicating defendant ran them through the nudify apps multiple times until he received what he wanted, but saved every iteration. Some of the iterations have age-appropriate breast development and appear to be aged 11-14, the actual age of the minor victims. The pictures often include added text superimposed on the image of the names and ages of the children – almost none older than 16. The superimposed text sometimes describes sex acts the children "want" to perform.

## III.  ARGUMENT

First, defendant's remedy is not ripe. Federal Rule of Criminal Procedure 12 provides Rule 12(b)(1) provides that a party may raise by pretrial motion any defense that "the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Here, however, defendant is asking the Court to make several decisions reserved for the finder-of-fact that are not appropriate for a 12(b)(1) motion.

Defendant has had access to all the discovery detailing the creation, possession, and distribution of the morphed images of MV1 and MV2 that depict more than mere nudity. Defendant jumps to the conclusion that because he could not discern which images were distributed to third parties, it is reasonable to assume the distributed images did not qualify as lascivious therefore precluding the government from reaching proof beyond a reasonable doubt at trial. This conclusion of fact that only the jury is allowed to make is precisely a "trial on the merits" that defendant is improperly asking the Court to reach pretrial. As such, his motion should be summarily denied.

3

Should the Court reach the merits, defendant's reliance on the First Amendment, and *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) is misplaced. Defendant claims a violation of his constitutional right to free speech under the First Amendment and the government's inability to prove the elements of the charged offenses. However, the speech is categorically unprotected and the elements argument inappropriate for a motion to dismiss.

### i. *Dost* Factor Test Inappropriate for Motion to Dismiss

The morphed images at issue in this case show both lascivious displays of the victims as well as the victims engaging in explicit sexual conduct. The morphed images satisfy the *Dost* factors and are child pornography under 18 U.S.C. § 2256(8). Defendant seeks to dismiss counts 1 & 2 claiming the indictment is insufficient and unsupported by the facts and that the facts cannot prove beyond a reasonable doubt the charges.

"An indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true." *United States v. Sampson*, 371 U.S. 75, 78–79, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962). "Courts should refrain from considering evidence outside the indictment when testing its legal sufficiency." *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994).

Here, defendant has made clear he objects to the facts as assumed in the indictment, and the government resists the characterization of the facts as laid out in defendant's motion to dismiss. As such, the operative facts are disputed, objected to, and a pretrial determination of the ability of the government to prove the

4

elements beyond a reasonable doubt, would be premature.  Defendant's argument

for dismissal of charges based on a factual inability to satisfy the *Dost* factors is

inappropriate for a motion to dismiss and should be addressed with the Court at the

time of trial.

### ii.        The First Amendment and the CPPA (1996)

Although the First Amendment protects non-obscene adult pornography, *see*

*generally United States v. Williams*, 553 U.S. 285, 288 (2008), adult pornography

that *is* obscene is unprotected by the First Amendment, *see id.* (citing *Miller v.*

*California*, 413 U.S. 15 (1973)).  Material is "obscene" if it "appeals to the prurient

interest, is patently offensive in light of community standards, and lacks serious

literary, artistic, political, or scientific value." *Ashcroft v. Free Speech Coalition*, 535

U.S. 234, 246 (2002) (citing *Miller*, 413 U.S. at 24).

> In 1982, the Supreme Court addressed the intersection of *child*
> pornography and the First Amendment and held in *New York v.*
> *Ferber*, 458 U.S. 747 (1982), that the production, distribution, and sale
> of child pornography receives no First Amendment protection. *Id.* at
> 756-765; *see Free Speech Coalition*, 535 U.S. at 249. Similarly, in 1990,
> the Court held in *Osborne v. Ohio*, 495 U.S. 103 (1990), that the First
> Amendment also does not protect the possession of child pornography.
> *See id.* at 111. Both *Ferber* and *Osborne* rest broadly on the idea that
> the government has an overriding interest in protecting children from
> sexual abuse and exploitation, including physical and "reputational
> and emotional harm," and in preventing the creation of a "permanent
> record" of the abuse and "destroy[ing]" the market for such material.
> *See, e.g.*, *Free Speech Coalition*, 535 U.S. at 249; *Osborne*, 495 U.S. at
> 109; *United States v. Mecham*, 950 F.3d 257, 265 (5th Cir. 2020). And
> neither decision requires that such a visual depiction be "obscene"
> under *Miller* in order to fall outside the First Amendment.

*Free Speech Coalition*, 535 U.S. at 240, 250.

In 1996, Congress enacted the Child Pornography Prevention Act of 1996 (CPPA), 18 U.S.C. § 2251 *et seq.*, the CPPA defined "child pornography" for purposes of Chapter 110 of the United States Code to mean "any visual depiction … of sexually explicit conduct, where—

> (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;
> (B) such visual depiction is, or appears to be, of a minor engaging in sexually explicit conduct;
> (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct; or
> (D) such visual depiction is advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct."

18 U.S.C. § 2256(8) (1996). The statute did not require proof that the material was "obscene" in order to fall within the definition of "child pornography." *See Free Speech Coalition*, 535 U.S. at 240, 246-249. In *Free Speech Coalition*, the Supreme Court held that two of the CPPA's definitions of child pornography—those set forth in Section 2256(8)(B) and (D)—violated the First Amendment. 535 U.S. at 256-258.

The Supreme Court held Subsection (8)(A) constitutional because it applies only to the abuse of actual children. *Free Speech Coalition*, 535 U.S. at 241. As relevant here, as to subsection (8)(C), the Court noted that the provision reaches "computer morphing" in which individuals "alter innocent pictures of real children so that the children appear to be engaged in sexual activity." *Id.* at 242. Subsection (8)(C) was not directly at issue in *Free Speech Coalition*, and so the Court did not resolve its constitutionality, but the Court noted in *dicta* that "[a]lthough morphed

images may fall within the definition of virtual child pornography, they implicate the interests of real children and are in that sense closer to the images in *Ferber*." *Id.*

The Supreme Court rejected arguments from the government that "eliminating the market for pornography produced using real children necessitates a prohibition on virtual images as well." *Free Speech Coalition*, 535 U.S. at 254. The Court noted the government's assertion that "[v]irtual images … are indistinguishable from real ones; they are part of the same market and are often exchanged," such that "virtual images promote the trafficking in works produced through the exploitation of real children." *Id.* The Court found the government's position "somewhat implausible" because "[i]f virtual images were identical to illegal child pornography, the illegal images would be driven from the market by the indistinguishable substitutes" because "[f]ew pornographers would risk prosecution by abusing real children if fictional, computerized images would suffice." *Id.* In the twenty-four years since *Free Speech Coalition*, even with further advancements in technology, this has not been the case, but it does not dimmish the government's compelling interest in regulating the conduct.

Although no known defendants had successfully prevailed on such a "computer-generated images defense," Justice Thomas noted that "technology may evolve to the point where it becomes impossible to enforce actual child pornography laws because the Government cannot prove that certain pornographic images are of real children." *Free Speech Coalition*, 535 U.S. at 259. If that were to happen,

Justice Thomas continued, "the Government should not be foreclosed from enacting a regulation of virtual child pornography that contains an appropriate affirmative defense or some other narrowly drawn restriction." *Id.* "But if technological advances thwart prosecution of 'unlawful speech,' the Government may well have a compelling interest in barring or otherwise regulating some narrow category of 'lawful speech' in order to enforce effectively laws against pornography made through the abuse of real children." *Id.*

In response to *Free Speech Coalition*, Congress enacted the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 (PROTECT Act). *See Williams*, 553 U.S. at 289. In connection with this statute, Congress made several specific findings, including that (i) technology was advancing such that it was becoming harder for the government to prove in any given case that an actual child was used in the production of child pornography; (ii) *Free Speech Coalition* was for this reason making the enforcement of child pornography laws increasingly more difficult; and (iii) Congressional action was necessary "[t]o avoid this grave threat to the Government's unquestioned compelling interest in effective enforcement of the child pornography laws that protect real children." *See* PROTECT Act, Congressional Findings, Pub. L. No. 108-21, 117 Stat. 677, § 501 (Apr. 30, 2003); *see also Williams*, 553 U.S. at 290-291.

Toward this end, the PROTECT Act amended Section 2256(8)'s definition of child pornography, however, as relevant here, sections 2256(8)(A) and (C) remain unchanged.

Many policy arguments that might support the need to prosecute virtual CSAM offenses—including, for example, that offenders may use virtual CSAM as a way to victimize actual children, that virtual CSAM will result in offenders victimizing more children, or that it may be difficult in a given case to prove whether the CSAM shows an actual child—were all raised and rejected in *Free Speech Coalition*. *See Free Speech Coalition,* at 251-256. However, technology has changed such that the government's need to prosecute virtual CSAM is more acute now than it was in 2002. In 2018, the CEO of Google, Sundar Pichai, stated, "AI is one of the most important things humanity is working on. It is more profound than, I dunno, electricity or fire." Catherine Clifford, "Google CEO: A.I. is more important than fire or electricity" (available at

https://www.cnbc.com/2018/02/01/google-ceo-sundar-pichai-ai-is-more-important-than-fire-electricity.html, last visited February 13, 2026). Most prominently, because the technology is much better and is relatively easy to use, offenders can more successfully create virtual CSAM that is hard to distinguish from actual CSAM. As a result, it will become increasingly more difficult in some cases for the government to prove in a criminal prosecution that an actual minor was victimized. *See, e.g.*, *Free Speech Coalition*, 535 U.S. at 263-264 (O'Connor, J., concurring in the judgment in part and dissenting in part) (explaining view that ban on virtual child pornography was permissible and specifically flagging concern about government's ability to prove that CSAM involved an actual child). Offenders bent on victimizing *actual* children may be more likely to do so if they think that they will avoid

9

prosecution or conviction on a government-cannot-prove-it-was-a-real-child defense. *See, e.g., Free Speech Coalition*, 535 U.S. at 259-260 (Thomas, J., concurring in the judgment).

Even if virtual CSAM is not categorically unprotected, Section 2256(8) nevertheless passes strict scrutiny and is therefore constitutional. The statutory prohibition on virtual CSAM is content-based, *cf. United States v. Stevens*, 559 U.S. 460, 468 (2010) (discussing content-based restrictions on speech), and as such, and assuming no categorical exclusion, the statute must "pass[] strict scrutiny" in that it is "justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 799 (2011). This is a "demanding standard" that requires the government to prove "an actual problem in need of solving" and that "the curtailment of free speech [is] actually necessary to the solution." *Id.* (internal quotation marks omitted). "It is rare that a regulation restricting speech because of its content will ever be permissible." *Id.* (internal quotation marks omitted); *see Stevens*, 559 U.S. at 468 (statutory regulation of "expression based on content" is "presumptively invalid" (internal quotation marks omitted)).

While it was not obvious to the Supreme Court in *Free Speech Coalition*, *see* 535 U.S. at 253-254 – that the government can "show a direct causal link between" virtual CSAM and "harm to minors" and it may be difficult to prove – further evidence now exists tying the direct causal link that was missing in previous versions of morphed images of CSAM. Recent publications have drawn the

10

conclusion that there is a link between the creation of these images and the harm to children.  *See Cézanne Van den Bergh, Legislation in the Age of Innovation: Regulating AI-Driven Child Sexual Abuse Material in the European Union – Fact or Fiction?* (available at

https://repository.gchumanrights.org/server/api/core/bitstreams/5d355fd0-80da-466b-8b00-7f999d6e8b35/content) (hereinafter the "EU piece").  In the EU piece, the authors note the causal link of normalizing the sexualization of children and the perpetualization of a culture that tolerates child abuse elevating the real-world risk of exploitation.  EU piece at 49.

> More concretely and directly, though, the authors note that
>
> diffusion models are trained on input data containing real CSAM, causing their weights to replicate existing content's features to produce new output. If this output exactly mimics the input containing real CSAM, there is a direct re-victimisation and causal link between the AI CSAM and the portrayed victim. However, victims are often not directly identifiable in AI CSAM, and the extent to which their material is integrated into the final image remains largely ambiguous, resulting in a more intricate form of re-victimisation. While these model weights perpetuate the characteristics of real CSAM and go beyond mere abstract figures, they do not include specific visual depictions of victims. Therefore, these model parameters often only indirectly and broadly correlate with harm to real victims through their memorisation and encapsulation of the non-visual features of the original training data.

EU piece at 49-50.  Basically, the computer systems that create these morphed, AI images of CSAM are "trained" on real images of CSAM causing actual, direct harm to children.  Even if these models do not produce images identical to or "indistinguishable from" the victims that they were "trained" on, those victims rights are still implicated, and they are still re-victimized by their images being

11

used in this way.  This technological advancement was not available at the time of *Free Speech Coalition* and as such could not be directly addressed.

### iii.  Morphed CSAM — 18 U.S.C. § 2256(8)(C)

Under 18 U.S.C. § 2256(8)(C), "child pornography" includes visual depictions that have "been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct."  "Identifiable minor," in turn, means a person—

> (i)(I) who was a minor at the time the visual depiction was created, adapted, or modified; or
> (II) whose image as a minor was used in creating, adapting, or modifying the visual depiction; and
> (ii) who is recognizable as an actual person by the person's face, likeness, or other distinguishing characteristic, such as a unique birthmark or other recognizable feature.

*Id.* § 2256(9)(A).  The term "identifiable minor" "shall not," however, "be construed to require proof of the actual identity of the identifiable minor."  *Id.* § 2256(9)(B). As such, Section 2256(8)(C) reaches cases in which, as in the case at bar, an offender uses an innocent picture of an actual child's face and virtually manipulates that picture to make it appear as though the minor is engaging in sexual activity.

In *Free Speech Coalition*, the Supreme Court briefly addressed Section 2256(8)(C).  The Court noted that the language reached "computer morphing" in which offenders, "[r]ather than creating original images," instead "alter innocent pictures of real children so that the children appear to be engaged in sexual activity."  *Free Speech Coalition*, 535 U.S. at 242.  The Court did not resolve the constitutionality of Section 2256(8)(C) (because it was not challenged in that case),

12

but the Court did note in *dicta* that "[a]lthough morphed images may fall within the definition of virtual child pornography, they implicate the interests of real children and are in that sense closer to the images in *Ferber.*" *Free Speech Coalition,* at 242; *see Shoemaker v. Taylor*, 730 F.3d 778, 787 (9th Cir. 2013) (deciding *Free Speech Coalition* suggested that "morphed images were more likely to be considered unprotected speech like the actual child pornography at issue in *Ferber*, rather than protected speech"); *United States v. Anderson*, 759 F.3d 891, 895–96 (8th Cir. 2014) (same, citing *Taylor*, 730 F.3d 778). "Although subjects of morphed images like [the victim] do not suffer the direct physical and psychological effects of sexual abuse that accompany the production of traditional child pornography, the morphed images' "continued existence causes the child victims continuing harm by haunting the children in years to come." *Anderson*, 759 F.3d 895–96 *(*citing *Osborne v. Ohio*, 495 U.S. 103, 111 (1990)).

In first holding that child pornography (involving actual children) is categorically unprotected under the First Amendment, the Supreme Court in *Ferber* and *Osborne* gave several reasons, including (i) the government's interest in safeguarding minors; (ii) the need to avoid creating a permanent record of the abuse; (iii) reducing the economic incentive to create it; (iv) the minimal value of such speech; and (v) the sheer "evil" of the speech so dramatically outweighs any relevant expressive interests. *See, e.g., United States v. Mecham*, 950 F.3d 257, 262 (5th Cir. 2020) (discussing *Ferber* and *Osborne*). A considerable part of this, up through and including *Free Speech Coalition*, is "the concern about reputational and

13

emotional harm to children." *Id.* at 265; *see id.* at 267 (Supreme Court's child-pornography decisions "have consistently cited the interest in preventing reputational and emotional to harm to children as a justification for the categorical exclusion of child pornography from the First Amendment").

In *United States v. Anderson*, 759 F.3d 891 (8th Cir. 2014) the Eighth Circuit held that the First Amendment does not apply to morphed child pornography in which "a minor's head [was] superimposed onto another minor's nude body." *Anderson*, 759 F.3d at 894 (discussing *United States v. Bach*, 400 F.3d 622, 632 (8th Cir. 2005)). The Eighth Circuit reasoned that minor-face-on-minor-body depictions implicated the interests of a real child and a real crime was recorded, and the minor whose face was superimposed suffers because a "lasting record" appearing to show that minor engaged in the activity has been created, such that the minor is victimized every time the image is shown. *Id.* at 894-895 (discussing *Bach*). However, the *Anderson* court held that morphed child pornography showing a real child's face on an adult's body was not categorically unprotected but held that the statute satisfied strict scrutiny and was therefore permissible. *Id.* at 895-896. The Court explained that in such images, "[n]o minor was sexually abused" but that the government has an "interest in protecting minors" and that the minor whose image appears on the adult body endures considerable harm from the depiction. *Id.*

Other Courts that have addressed the issue have agreed that morphed CSAM causes real harm to real children. *See Doe v. Boland*, 698 F.3d 877, 884 (6th Cir. 2012) ("By using identifiable features of children," such material "place[s] actual

14

minors at risk of reputational harm."). Consistent with this understanding, several courts have held post-*Free Speech Coalition* that morphed child pornography falls outside the scope of the First Amendment. *See, e.g.*, *Mecham*, 950 F.3d at 267 ("We conclude that because morphed child pornography depicts an identifiable child, it falls outside the First Amendment."); *Doe*, 698 F.3d at 883 (minors' likenesses identifiable in images were real victims with real injuries offering one reason for rejecting defendant's First Amendment challenge.); *United State v. Hotaling*, 634 F.3d 725, 730 (2nd Cir. 2011) (distinguishing *Free Speech Coalition*, finding six identifiable minor females at risk of reputational harm suffered psychological harm of knowing their images were exploited and prepared for distribution by a trusted adult.).

The case at bar is more comparable to *Ferber, Hotaling and Anderson*. The defendant here used innocent pictures of several minor children and morphed them into sexually explicit images. First, the conduct here, as in *Anderson*, implicates the interests of a real child and a real crime was recorded, and the minor whose body was superimposed suffers because a "lasting record" appearing to show that minor engaged in the activity has been created, such that the minor is victimized every time the image is shown. Second, used the minor-faced images of the children and AI-generated nudity onto the images that in several instances is commensurate with the age of the child – a minor-bodied imaged; similar to *Anderson*'s minor-face-on-minor-body depictions that the Eighth Circuit held were not protected speech. *Anderson*, 759 F.3d at 894. Some of the images depict the real minor child's face on

15

an adult's body which the *Anderson* Court held was "not categorically unprotected but held that the statute satisfied strict scrutiny and was therefore permissible." *Id.* at 895-896. Similarly, the speech involving the limited number of images that depict the real minor child's face on an adult's body here may not be categorically unprotected, but the Eighth Circuit has stated that the government's interest in protecting children is compelling enough to withstand strict scrutiny. *Id.* at 895-896.

Third, defendant took additional steps to distribute the images to other individuals in an effort to solicit interstate travel to engage in sexual activity with the minor children. Fourth, defendant was a trusted adult in the children's lives similar to *Hotaling*. Defendant alerted the victim families to the existence of the images – claiming he had been sent the images by unnamed persons online but could not show the images to the families – thereby creating further psychological harm to the children. It became clear to the families of the minor children that defendant had created the images. These additional steps implicate additional interests of the child that further track almost fact-for-fact, the compelling state interests for restriction of this speech that previous courts have upheld.

16

## IV.   CONCLUSION

For the reasons above, the Court should deny defendant's motion to dismiss the Indictment.

Respectfully submitted,

LEIF OLSON
United States Attorney

By: */s/ Kraig R. Hamit*

KRAIG R. HAMIT
Assistant United States Attorney
600 4th Street, Ste. 670
Sioux City, Iowa 51101
(712) 255-6011
(712) 252-2034 – Fax
Kraig.Hamit@usdoj.gov

CERTIFICATE OF SERVICE

I certify that I electronically served a copy of the foregoing document to which this certificate is attached to the parties or attorneys of record, on March 4, 2026.

UNITED STATES ATTORNEY

BY:  s/   Jean Wordekemper